NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRETT FINANCIAL OF NORTH JERSEY, LLC,<br>        Plaintiff,<br><br>  v.<br><br>CREATIVE FINANCIAL GROUP OF NEW JERSEY,<br><br>        Defendant. | Civ. No. 13-5621 |
| BARRETT FINANCIAL OF NORTH JERSEY, LLC and EDWARD P. BARRETT,<br><br>    Plaintiffs/Counterclaim Defendants,<br><br>  v.<br><br>NEW ENGLAND LIFE INSURANCE COMPANY,<br><br>    Defendant/Counterclaim Plaintiff. | Civ. No. 14-3316<br><br><br>**OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on the Motion to Alter/Amend the Verdict to Include

Pre-Judgment Interest brought by Plaintiffs Barrett Financial of North Jersey, LLC ("Barrett

Financial")[1] and Edward P. Barrett ("Mr. Barrett") (collectively, "Plaintiffs") (ECF No. 186)[2]

and the Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial

or Amendment of the Verdict brought by Defendants Creative Financial Group of New Jersey

("Creative Financial") and New England Life Insurance Company ("NELICO") (collectively,

---

[1] Unless otherwise indicated, Barrett Financial is used synonymously with New England Financial.

[2] Unless otherwise indicated, every CM/ECF citation refers to Civil Docket No. 14-3316.

1

"Defendants") (ECF No. 191). Defendants and Plaintiffs, respectively, oppose each other's motion. (ECF Nos. 188, 195.) The Court has decided the Motions after considering the written submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the following reasons, Plaintiffs' Motion to Alter/Amend the Verdict to Include Pre-Judgment Interest is denied without prejudice, and Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Amendment of the Verdict is granted in part and denied in part. The Court grants judgment as a matter of law in favor of Defendants in regard to Plaintiffs' claim for breach of good faith and fair dealing and orders a new trial in regard to Defendants' counterclaim for breach of contract.

## BACKGROUND

These two actions arise out of a single contractual relationship and the fallout after its termination.[3] Mr. Barrett, owner of Barrett Financial, became an independent contractor and a managing partner for NELICO in 2000. In December 2007, the parties executed the Corporate Managing Partner Contract (he "Contract"), which refers to Mr. Barrett as the "Corporate Manager" and Barrett Financial as the "Corporate Managing Partner." (*See* Contract, Pls.' Ex. 5.)[4] Pursuant to the Contract, Mr. Barrett and Barrett Financial agreed to "exclusively market the product and services of [NELICO]." (*Id.* § 2.)

I.      **The Contract**

Several portions of the Contract are of import here. First, Section 5 of the Contract governed the employment relationship between the parties and hired personnel. The Contract

---

[3] The Court also incorporates by reference the factual recitation contained in its Summary Judgment Opinion dated July 24, 2018. (Op. at 2–8, ECF No. 118.)
[4] Unless otherwise indicated, all exhibits numbers refer to the exhibits presented during trial.

permitted Barrett Financial to "appoint and contract with agents and brokers." (*Id.* § 5.)

However, it also stated that NELICO

    (a)    "shall employ and make available to [Barrett Financial] certain personnel . . . to perform administrative functions" (referred to as "Administrative Personnel"); and

    (b)    "shall employ certain of its insurance agents whom [Barrett Financial] designates and, subject to [NELICO]'s approval of such designation, shall make them available to [Barrett Financial] to serve as managing associates" (referred to as "Managerial Personnel").

(*Id.* § 6.) The Contract referred to all of these individuals collectively as "NELICO Personnel."

(*Id.*) It also designated Barrett Financial as its pay agent, "responsible for all payroll functions" such as paying compensation and withholding tax payments. (*Id.*)

The Contract also governed the procedures regarding its termination. Section 17 conferred on either party "the right to terminate the Contract without cause at any prior time" as long as that party provided sixty days of notice. Upon termination, NELICO would pay Mr. Barrett "renewal overrides." (*Id.* § 12.) Also upon termination, any debts owed by Barrett Financial to NELICO, or any amounts or renewal overrides owed by NELICO to Barrett Financial, would be due within ninety days of termination, subject to the right to offset or balance any obligation. (*Id.* §§ 17–18.) However, Section 16 specified that "if [Barrett Financial or Mr. Barrett] shall knowingly act in a fraudulent or unlawful manner . . . the Contract shall at once terminate without notice" and "[Mr. Barrett]'s claims for revenue or any other benefit under the Contract . . . shall be forfeited and void." (*Id.* § 16.)

## II.    Termination of the Contract

Soon after NELICO took over payroll responsibilities from Mr. Barrett in April 2012, it noticed that Mr. Barrett had been sponsoring and employing foreign workers by utilizing H-1B visas. Although Mr. Barrett had consulted an immigration attorney, Glenn Martin Miller, to

oversee the sponsorship applications, NELICO believed that the applications were misleading and potentially unlawful.  After internal investigation, NELICO concluded that Mr. Barrett had submitted fraudulent or misleading H-1B visa applications that (a) included invented job titles to suggest greater specialization than was required for the positions; (b) misrepresented the degree requirements and duties of the jobs for which the workers were hired; and (c) obfuscated the hours that the workers' salaries would support, ultimately paying these workers less than the prevailing federal minimum wage by sponsoring them for a part-time salary but staffing them with full-time duties.

On August 1, 2012, NELICO terminated Mr. Barrett and Barrett Financial effective September 30, 2012, effectively suspending him for sixty days (the "Termination Letter").  (Pls.' Ex. 18.)  The Termination Letter did not state whether NELICO was invoking its right to terminate the Contract under Sections 16 or 17, but it noted that it was doing so "for the reasons that [Michelle Pedigo, Regional Vice-President of NELICO, and Mr. Barrett] discussed."  (*Id.*) NELICO subsequently submitted a required Form U5 to the Financial Industry Regulatory Authority ("FINRA") that gave "LOSS OF CONFIDENCE (NON-SECURITIES RELATED)" as the explanation for Mr. Barrett's termination.  (Pls.' Ex. 29.)

After the termination, NELICO replaced Barrett Financial with Creative Financial as Corporate Managing Partner and installed Chris Furrule in Mr. Barrett's place as Managing Partner.  While Barrett Financial had served as Corporate Managing Partner under the Contract, its legal name was New England Financial Group of North Jersey, LLC ("New England Financial").  After termination, however, Mr. Barrett changed his entity's name from New England Financial to Barrett Financial at NELICO's urging because, pursuant to the Contract, the name "New England Financial" was a registered trademark owned by NELICO.  (*See*

Contract § 21; Pls.' Ex. 59 (name-change certificate).)  Shortly thereafter, with the approval and

oversight of NELICO, Creative Financial issued a press release and bought an advertisement in

Forbes magazine announcing the "merger" of New England Financial and Creative Financial and

the appointment of Mr. Furrule as Managing Partner.  (Pls.' Ex. 36.)  Mr. Furrule did not pay any

amount to NELICO in exchange for his increased management responsibilities or to obtain

equity in New England Financial or Creative Financial at the time of this "merger"; Mr. Barrett

remained the sole owner of Barrett Financial after its name change.  During the transition,

NELICO conducted a reconciliation pursuant to the Contract and determined that NELICO and

Barrett Financial each owed debts to one another.

## III.    Procedural History

Plaintiffs filed two separate lawsuits against Defendants with a host of contract and tort

claims.  On January 12, 2018, the parties filed cross motions for summary judgment.  (ECF Nos.

94, 96.)  On July 24, 2018, the Court denied Plaintiffs' Motion for Summary Judgment and

granted in part and denied in part Defendants' Motion for Summary Judgment.  (Order, ECF No.

119.)  The following claims remained viable: Plaintiffs' claims for conversion and trespass to

chattels in regard to physical property (Counts I and II), Plaintiffs' claims for breach of contract

and breach of good faith and fair dealing (Counts III and VI),  Plaintiffs' claim for

indemnification (Count VII), Defendants' counterclaims for breach of contract and breach of

good faith and fair dealing (Counts I and II), and Defendants' counterclaim for indemnification

(Count III).[5]  (See Order at 1–2.)[6]

---

[5] Defendants subsequently elected to drop their counterclaim for indemnification during trial.
(See Trial Tr. 89:2–3 (Feb. 14, 2019, PM), ECF No. 171.)
[6] Plaintiffs' claims refer to their Amended Complaint.  (See ECF No. 23.)  Defendants'
counterclaims refer to their Answer to Amended Complaint and Counterclaims.  (See ECF Nos.
9, 28.)

On December 20, 2018, Defendants filed a Motion *in Limine* to Strike Plaintiffs' Claim for Damages Premised upon Equity "Buy-Out" and Exclude Christopher Kyanko's Testimony. (ECF No. 129.)  Defendants argued that, in regard to Plaintiffs' claim for breach of good faith and fair dealing, Plaintiffs sought "damages representative of a 'buy out' of the so-called equity interest in [New England Financial]" but "Plaintiffs ha[d] no equity interest and NELICO had no obligation to purchase the non-existent equity interest."  (Defs.' Mot. in Limine Br. at 1, ECF No. 129-1.)  Defendants, therefore, "move[d] this Court to strike Plaintiffs' claim for damages to the extent it purports to seek a 'buy out' of the alleged 'equity' in [New England Financial] following NELICO's termination of the [Contract]" and exclude the testimony Mr. Kyanko, whose analysis and report valued Mr. Barrett's "equity ownership" in New England Financial at the time of termination at over $2 million.  (*See id.* at 1–3, 6–9.)  Plaintiffs opposed the Motion on January 7, 2019 (ECF No. 134), and the Court held oral argument on January 11, 2019 (ECF No. 139).  On January 23, 2019, the Court held in abeyance Defendants' motion to bar Mr. Kyanko's testimony.  (ECF No. 144.)

## IV.    Trial and Verdict

On February 7, 2019, the Court commenced a jury trial to resolve the remaining issues. (*See* ECF Nos. 151–80.)  On February 14, 2019, after Plaintiffs rested, Defendants moved for judgment as a matter of law on all claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  (*See* Trial Tr. 12:8–13:7 (Feb. 14, 2019, AM), ECF No. 170.)  Later that same day, after Defendants rested but before the parties presented their summations, Defendants again moved for judgment as a matter of law.  (*See* Trial Tr. 81:13–15, 90:19–96:21 (Feb. 14, 2019, PM) (arguing for directed verdict); *id.* 97:6–11 ("I'm going to say once again . . . we respectfully request that we avoid the prejudice and confusion that will likely flow from a charge that has to

deal with claims in this case which have no merit . . . and dismiss them at this point in the case.").)[7]

The Court reserved its ruling on both occasions. (*See* Trial Tr. 54:3–22 (Feb. 14, 2019, AM) (reserving on motion for directed verdict); Trial Tr. 97:13–20 (Feb. 14, 2019, PM) ("I want to think some more about these motions. . . . I may be inclined to reserve, subject to resubmission by a party whose verdict the party feels is inappropriate."); *see also* Trial Tr. 14:4–7 (Feb. 19, 2019, AM), ECF No. 174 (responding to Defendants' objections to the jury charge, "I think I've told you that I view that as a meritorious argument, and that I'm reserving on your motion to dismiss the [P]laintiffs' claim of good faith and fair dealing with regard to the sale of the agency.").)

On February 20, 2019, the jury returned its verdict. (*See* Verdict Form, ECF No. 182.) For purposes of Defendants' Motion, the jury first found that NELICO breached the Contract by failing to pay Mr. Barrett for the renewal overrides provided for in the Contract, but it found that NELICO failed to prove that Mr. Barrett knowingly acted in a fraudulent or unlawful manner with regard to the H-1B visas which would have resulted in forfeiture of the payment of the overrides. (Verdict Form, Questions 1–2.) The jury awarded $955,574.79, an amount to which the parties stipulated, to Mr. Barrett for this claim. (Verdict Form, Question 3.)

Second, the jury found that NELICO breached the covenant of good faith and fair dealing. (Verdict Form, Question 4.) When asked how NELICO did so, the jury answered as follows:

> NELICO did not include all of the revenues (as outlined in the [C]ontract) for the months of Aug & Sept 2012 in their true-up or reconciliation. NELICO only

---

[7] Plaintiffs seem to contend in their opposition that Defendants never moved for judgment as a matter of law. (Pls.' Br. at 5, ECF No. 195 (contending that "it isn't clear that Defendants even preserved the right to seek a renewed motion for judgment as a matter of law on this issue").)

included one revenue class and included ALL expenses . . . as well as a few
credits.

(Verdict Form, Question 5.)  The jury awarded $75,781.66 to Mr. Barrett on this claim.  (Verdict

Form, Questions 6–7.)

Finally, the jury found that Plaintiffs also breached the Contract.  (Verdict Form,

Question 12.)  Unlike Plaintiffs' breach-of-contract claim, however, the parties did not stipulate

to an amount, so the jury was asked the amount due to NELICO under the Contract.  The jury

wrote "$0.00."  (Verdict Form, Question 13.)

## V.    Post-Trial Motions

On March 7, 2019, Plaintiffs filed their Motion to Alter/Amend the Verdict to Include

Pre-Judgment Interest.  (ECF No. 186.)  Defendants opposed the Motion on March 18, 2019

(ECF No. 188), and Plaintiffs replied on March 22, 2019 (ECF No. 190).  Defendants filed their

Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or

Amendment of the Verdict on March 22, 2019.  (ECF No. 191.)[8]  Plaintiffs opposed Defendants'

Motion on April 1, 2019 (ECF No. 195), and Defendants replied on April 8, 2019 (ECF No.

196).  Although both parties have filed a Notice of Appeal (ECF Nos. 187, 194), the U.S. Court

of Appeals for the Third Circuit issued an order staying its proceedings pending this Court's

disposition of the parties' post-trial motions, so there is no dispute that this Court has jurisdiction

to rule on the two post-trial Motions currently before the Court.  (*See* Order, Court of Appeals

Docket No. 19-1581 (Mar. 19, 2019).)

---

[8] On March 25, 2019, Defendants filed a Motion to Stay Proceedings to Enforce Judgment.
(ECF No. 192.)  On March 27, 2019, the Court granted Defendants' Motion to Stay pending
resolution of the parties' post-trial motions and any appeals.  (ECF No. 193.)

<u>**LEGAL STANDARDS**</u>

**I.      Judgment as a Matter of Law Pursuant to Rule 50**

A party may move for judgment as a matter of law pursuant to Rule 50 of the Federal

Rules of Civil Procedure if, after a party has been fully heard on an issue, "the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue." Fed. R. Civ. P. 50(a). "If the court does not grant a motion for judgment as a matter of

law made under Rule 50(a) . . . . the movant may file a renewed motion for judgment as a matter

of law," whereby the district court may order a new trial or direct the entry of judgment as a

matter of law. Fed. R. Civ. P. 50(b). However, "[a] judgment notwithstanding the verdict may

be granted under [Rule] 50(b) only if, as a matter of law, the record is critically deficient of that

minimum quantity of evidence from which a jury might reasonably afford relief." *Watcher v.*

*Pottsville Area Emergency Med. Servs.*, 248 F. App'x 272, 279-80 (3d Cir. 2007) (quoting

*Powell v. J.T. Posey Co.*, 766 F.2d 131, 133–34 (3d Cir.1985)). Indeed, "[t]he test is a stringent

one." *Id.* (citing *Mosley v. Wilson*, 102 F.3d 85, 90 (3d Cir. 1996)).

**II.      Motion for a New Trial Pursuant to Rule 59**

Rule 59 of the Federal Rules of Civil Procedure allows a district court to "grant a new

trial on all or some of the issues . . . after a jury trial." Fed. R. Civ. P. 59(a)(1). "A Rule

59(a)(1)(A) motion should be granted only when 'the great weight of the evidence cuts against

the verdict and . . . a miscarriage of justice would result if the verdict were to stand.'" *Solomon*

*v. Sch. Dist.*, 532 F. App'x 154, 157 (3d Cir. 2013) (quoting *Springer v. Henry*, 435 F.3d 268,

274 (3d Cir. 2006)). "The decision whether or not to grant a new trial is committed to the sound

discretion of the district court." *Winnicki v. Bennigan's*, 2006 U.S. Dist. LEXIS 61206, at *2

(D.N.J. Aug. 28, 2006) (citing *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir.

1995)).  But, "[w]here the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations."  *Hilburn v. State Dep't of Corr.*, 2012 U.S. Dist. LEXIS 106536, at *29 (D.N.J. July 31, 2012) (quoting *Williamson v. CONRAIL*, 926 F.2d 1344, 1352 (3d Cir. 1991)).

District courts may also "alter or amend a judgment" pursuant to Rule 59(e).  Alteration or amendment is warranted when the movant demonstrates "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011) (emphasis omitted) (quoting *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010)).  "The scope of a [Rule 59(e)] motion . . . is extremely limited.  Such motions are not to be used as an opportunity to relitigate the case; rather, they may be used only to correct manifest errors of law or fact or to present newly discovered evidence."  *Id.* (citing *Howard Hess*, 602 F.3d at 251).

## DISCUSSION

I.      **Plaintiffs' Claim for Breach of Implied Covenant of Good Faith and Fair Dealing**

Under New Jersey law, "there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'"  *Sons of Thunder v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (quoting *Palisades Properties, Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965)) (collecting cases); *see also Kalogeras v. 239 Broad Ave., L.L.C.*, 997 A.2d 943, 953 (N.J. 2010) (explaining that good faith

and fair dealing need not derive from an express contractual term as "the implied covenant of good faith and fair dealing is precisely what its name allows: it is an implied covenant").

Generally, courts have applied the implied covenant of good faith and fair dealing in three ways. "First, the covenant permits the inclusion of terms and conditions which have not been expressly set forth in the written contract" but which "the parties must have intended . . . because they are necessary to give business efficacy to the contract." *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1076 (Super. Ct. App. Div. 2002) (citing *Onderdonk v. Presbyterian Homes of N.J.*, 425 A.2d 1057, 1062–64 (N.J. 1981); *N.J. Bank v. Palladino*, 389 A.2d 454, 461–62 (N.J. 1978); *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 352–53 (N.J. 1976)). "Second, the covenant has been utilized to allow redress for the bad faith performance of an agreement even when the defendant has not breached any express term . . . . And third, the covenant has been held . . . to permit inquiry into a party's exercise of discretion expressly granted by a contract's terms." *Id.* For instance, even where a contract permits a party to exercise its discretion, that party may not exercise "its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001).

A.    *Plaintiffs' Trial Position*

During trial, Plaintiffs asserted one theory for their claim of breach of good faith and fair dealing: "rather than just terminating the [Contract], NELICO wrongfully seized [Mr.] Barrett's business from [him]. And [Mr. Barrett] is seeking an award for the value of the business that they took from him." (Trial Tr. 71:21–72:1 (Feb. 19, 2019, PM), ECF No. 175 (Plaintiffs' closing argument); *see also id.* 103:25–107:19 (discussing the contours of Plaintiffs' breach-of-

good-faith-and-fair-dealing claim during Plaintiffs' closing argument).) The Court's jury charge

similarly illustrates Plaintiffs' sole theory for this claim:

> In this case, Mr. Barrett asserts that NELICO breached the covenant of good faith
> and fair dealing when it took over his business, what he claims is his business,
> after the contract was terminated instead of allowing him to sell what he viewed
> as his business, the agency. This is referring to the business that Mr. Kyanko
> discussed and . . . [e]valuated in his testimony. So, if you find that Mr. Barrett
> proved he was entitled to this sale, you would calculate the appropriate amount of
> damages based on the evidence in the case. However, Mr. Barrett's good faith
> and fair dealing claim is not to be confused with his breach of contract claim.

(Trial Tr. 70:23–71:9 (Feb. 19, 2019, AM) (jury charge).)

Plaintiffs derive this claim primarily from Section 19 in the Contract, detailing the

conditions by which Barrett Financial may assign its interest (the "Assignment Clause"). (*See*

Trial Tr. 105:4–23 (Feb. 19, 2019, PM.) The Assignment Clause provides in whole as follows:

> No assignment or attempted assignment of the Contract, or any rights accruing
> hereunder, by [Barrett Financial], or its successors, shall be effective against
> [NELICO] unless the assignment (a) is set forth on [NELICO]-approved forms;
> (b) is agreed to in writing by an authorized officer of [NELICO]; (c) clearly
> designates the assignee; (d) recites [NELICO]'s first and prior lien on [Barrett
> Financial] revenue and other payments under the Contract; and (e) is filed with
> [NELICO] at its Home Office.

(Contract § 19.) By terminating Mr. Barrett and hiring Mr. Furrule as his successor, Plaintiffs

contend, Defendants precluded Mr. Barrett from selling Barrett Financial. Plaintiffs pondered to

the jury during closing arguments, "[W]hy is that assignment provision in the contract? It only

makes sense in the contract if it's anticipated that there's an owner like [Mr. Barrett] who's

going to sell his business someday and assign it to the next owner." (Trial Tr. 105:12–16 (Feb.

19, 2019, PM).)

Plaintiffs offered testimony and several pieces of evidence in support of their claim.

First, Mr. Barrett originally purchased Barrett Financial (at the time, New England Financial)

from James Figurelli on December 31, 2002 (the "Figurelli-Barrett Contract").[9] (*See* Pls.' Ex. 2 (purchase agreement); *see also* Pls.' Ex. 58 (Mr. Figurelli's certificate of formation dated December 10, 1999).) Mr. Barrett, then a 42% owner of New England Financial, purchased Mr. Figurelli's 58% interest for $50,000. (*See* Pls.' Ex. 2; *see also* Trial Tr. 41–45:24 (Feb. 7, 2019, PM) (Mr. Barrett describing circumstances of purchase).) Mr. Barrett claimed that he was entitled to a similar sale between him and his successor. (Trial Tr. 53:19–54:1 (Feb. 7, 2019, PM).) Second, Creative Financial issued a press release and bought an advertisement in Forbes magazine announcing the "merger" of New England Financial and Creative Financial. (Pls.' Ex. 36.) Third, in anticipation of the "merger," NELICO created—but never presented or published—a PowerPoint slide titled "Strategic Implications of Realignment" that stated, "To realign North Jersey into [Creative Financial], [NELICO] will charge [Creative Financial] $100k per year for 10 years," indicating, as Mr. Barrett claimed, that one must "buy" the business in order to run its operations. (*See* Pls.' Ex. 25 at 3.) Fourth, Mr. Barrett had filed tax forms on behalf of New England Financial. (*See, e.g.*, Pls.' Ex. 57 (tax forms); *see also* Trial Tr. 69:18–70:24 (Feb. 11, 2019, AM), ECF No. 166.) Finally, Mr. Kyanko testified that if Mr. Barrett had been allowed to sell New England Financial in an arms-length transaction in August 2012, its value would have been around $2 million. (*See, e.g.*, Trial Tr. 131:9–132:5 (Feb. 13, 2019, PM), ECF No. 169.)

B.    *Defendants Are Entitled to Judgment as a Matter of Law*

Pursuant to Defendants' Renewed Motion, Defendants are entitled to judgment as a matter of law on Plaintiffs' claim for breach of the implied covenant of good faith and fair

---

[9] When Mr. Barrett initially joined the organization in 1991, its name was Figurelli Financial. (Trial Tr. 37:18–20 (Feb. 7, 2019, PM), ECF No. 153.)

dealing.  First and most importantly, Plaintiffs contend that the Assignment Clause suggested

that Mr. Barrett was entitled to "sell" New England Financial at the end of his tenure.  Plaintiffs,

however, do not allege that NELICO breached the Assignment Clause; rather, Plaintiffs allege

that NELICO breached the spirit of the Assignment Clause.  Plaintiffs present no evidence that,

at the time of his termination, Mr. Barrett had found a buyer or even had looked for a buyer for

New England Financial.  It is not as if NELICO rejected a proposed assignee and then retaliated

against Mr. Barrett by terminating him pursuant to the at-will provision in the Contract.  Instead,

Mr. Barrett demanded a "buyout" from NELICO *after* NELICO already exercised its right to

terminate his employment with sixty days of notice.  (*See* Pls.' Ex. 19 (email from Mr. Barrett).)

Plaintiffs' theory is akin to a tenant claiming money damages—only after the landlord validly

terminated the lease—because the tenant never exercised his right to assign or sublet the rental

property during his term of the lease.

Moreover, the Contract specifically outlined the procedure to be followed upon

termination.  Section 12 ("Revenue After Termination of the Contract"), Section 16 ("Forfeiture

of Contract"), and Section 17 ("Termination of the Contract") governed the parties' relationship

vis-à-vis termination and created an at-will relationship whereby either party had "the right to

terminate the Contract without cause at any prior time" as long as that party provided sixty days

of notice.  Section 17 also addressed how the parties should handle any debts that may be

outstanding at the time of termination.

Plaintiffs seem to suggest that the Assignment Clause *contemplates* that such a "sale"

could occur, but Plaintiffs miss the point that the Contract *expressly provides* that NELICO may

terminate the employment relationship at any time.  One need not mentally strain in order to

interpret the clause concerning termination, but Plaintiffs' creative construction of and

disproportionate emphasis on the Assignment Clause directly conflicts with that express

provision of the Contract. Plaintiffs ponder, "[W]hy is that assignment provision in the contract?

It only makes sense in the contract if it's anticipated that there's an owner like [Mr. Barrett]

who's going to sell his business someday and assign it to the next owner." (Trial Tr. 105:12–16

(Feb. 19, 2019, PM).) On the contrary, however, the Assignment Clause merely appears to

*protect NELICO* by preventing Mr. Barrett from unilaterally installing a recalcitrant or

unqualified Corporate Manager or Corporate Managing Partner. Ms. Pedigo, who oversaw

NELICO agencies like Barrett Financial at the time of termination, testified that "there is no

buyout" and that "there is no equity stake in the firm" for Mr. Barrett. (Trial Tr. 125:24–126:10

(Feb. 11, 2019, AM); *see also* Trial Tr. 44:20–45:6 (Feb. 11, 2019, PM), ECF No. 167.) Wishful

thinking notwithstanding, the Contract simply does not say what Plaintiffs allege it does.

Plaintiffs point to the Figurelli-Barrett Contract and urge the Court to extrapolate from

this "sale" in 2002 that Mr. Barrett was entitled to a similar sale in 2012. Simply stated,

however, the Figurelli-Barrett Contract is irrelevant to the Contract at issue here. Not only was it

executed about five years before the Contract, but NELICO was not even a party to it. In fact,

NELICO was not even mentioned in the Figurelli-Barrett Contract. (*See* Trial Tr. 41:18–47:14

(Feb. 11, 2019, AM).) The Court struggles to see the viability of the extrapolation that Plaintiffs

urge from the Figurelli-Barrett Contract.

The PowerPoint slide titled "Strategic Implications of Realignment" is equally

unpersuasive. (*See* Pls.' Ex. 25 at 3 ("To realign North Jersey into [Creative Financial],

[NELICO] will charge [Creative Financial] $100k per year for 10 years.").) This exhibit,

Plaintiffs contend, suggests that Defendants contemplated "selling" Creative Financial (the

successor of New England Financial) to Mr. Furrule (Mr. Barrett's successor). But Ms. Pedigo

testified that this PowerPoint slide was never shared with anyone and that "there was no payment[] made [by Mr. Furrule for Creative Financial] and there was no . . . decision to do that because there's no equity in the firm." (Trial Tr. 139:24–144:10 (Feb. 11, 2019, AM).) She further testified that historically, "including when MetLife [the parent company of NELICO] managing partners went to Mass Mutual, no one was paid anything for any of their businesses, because there's no equity in the firm." (Trial Tr. 47:4–49:5 (Feb. 11, 2019, PM).)

Plaintiffs also submit that an advertisement in Forbes magazine announcing the "merger" of New England Financial and Creative Financial somehow suggests that New England Financial was up for sale. However, Mr. Barrett never owned the name "New England Financial." The Contract specifically delineated that Mr. Barrett "agree[d] that the trademark 'New England Financial' . . . [was] the sole and exclusive property of [NELICO]." (Contract § 21(a).) The Contract also granted to Mr. Barrett "a nonexclusive, personal, nontransferable, nonsublicensable and nondelegable right and license to use the [name] in connection with the products and services of [NELICO]" only "as long as [Mr. Barrett] [was] a Corporate Managing Partner of [NELICO]." (*Id.* § 21(b)–(e).) "This [l]icense shall terminate . . . when the Contract terminates" whereupon Mr. Barrett "shall immediately and permanently cease and desist from all use of the [name] in any way." (*Id.*) Indeed, the specific legal entity that Mr. Barrett bought from Mr. Figurelli in 2002 remains under his ownership *to this day*. Mr. Barrett has maintained its ownership and merely changed its name to Barrett Financial. (*See* Pls.' Ex. 59 (name-change certificate).) NELICO merged New England Financial and Creative Financial in name only—no two, separate legal entities ever existed to merge. Plaintiffs' argument that a forced sale occurred is belied by the very fact that the "sold" item is still owned, possessed, and operated by the alleged seller.

Additionally, despite Plaintiffs' contentions, the evidence in the record also demonstrates that the agents working for Plaintiffs actually belonged to NELICO, further undermining the fiction that NELICO "seized" Mr. Barrett's business.  Plaintiffs rely on an email from November 2000 that attached a memorandum indicating that New England Financial had the authority to hire agents.  (*See* Pls.' Ex. 1.)  But the Contract is not inconsistent with this memorandum: the Contract permitted Plaintiffs to employ both Administrative Personnel and Managerial Personnel—the Contract even referred to these workers as "NELICO Personnel."  (Contract § 6.) NELICO authorized these workers via Agent GDC contracts.  (*See* Defs.' Exs. 79–81; *see also* Trial Tr. 49–62 (Feb. 11, 2019, AM) (cross examining Mr. Barrett regarding Agent GDC contracts).)  And Ms. Pedigo testified that the agents were workers of NELICO.  (Trial Tr. 7–9 (Feb. 11, 2019, PM).)

Plaintiffs highlight the fact that Mr. Barrett had filed tax forms on behalf of New England Financial.  (*See, e.g.*, Pls.' Ex. 57.)  But again, this conduct is not in conflict with the Contract: Section 6 designated Barrett Financial as its pay agent, "responsible for all payroll functions" such as paying compensation and withholding tax payments.  Consistent with the Contract, NELICO authorized Mr. Barrett to hire personnel, withhold their taxes, and supervise them—but they were not Mr. Barrett's workers.

Kumar Das Gupta—who worked at MetLife, the parent company of NELICO, for fifteen years and was responsible for the financial books and records as chief financial officer for its distribution channel—confirmed that Mr. Barrett acted as a pay agent and that New England Financial's workers were "registered agents of NELICO."  (Trial Tr. 127:2–130:17, 155:18–22 (Feb. 13, 2019, AM), ECF No. 168.)  Mr. Das Gupta discussed Agent GDC contracts, 1099 tax forms, and W-2s, which all listed NELICO as the agents' employer and which were maintained

at NELICO's offices.  (*Id.* 142:20–149:5; Trial Tr. 55:11–56:15 (Feb. 13, 2019, PM); *see also* Defs.' Ex. 82 (summary exhibit of 1099 and W-2 tax forms).)  He also testified extensively about how money flowed from NELICO to New England Financial.  (*See* Trial Tr. 111:14–165:10 (Feb. 13, 2019, AM); Trial Tr. 6:23–56:5 (Feb. 13, 2019, PM).)  Mr. Das Gupta explained that New England Financial was a NELICO agency and that Mr. Barrett merely managed it; NELICO had provided New England Financial with "allowances" to pay for various expenses and "reimbursements" if New England Financial had paid the expense in advance.

Although Mr. Kyanko's testimony put a price tag on Barrett Financial at the time of termination, his testimony entirely fails to prove that Mr. Barrett was legally entitled to some sort of sale.  Mr. Kyanko did not analyze whether NELICO seized Mr. Barrett's business, nor did he offer any opinion as to who owned what.[10]  Mr. Kyanko merely postulated about "the price . . . [that] would be hypothetically paid [from] a hypothetical buyer [to] a hypothetical seller" and assumed, for purposes of his report, that Mr. Barrett owned something to sell.  (*See* Trial Tr. 131:9–132:5, 167:10–23 (Feb. 13, 2019, PM); *see also* Trial Tr. 46:5–47:11 (Feb. 19, 2019, PM) (discussing, during closing argument, that Mr. Kyanko did not offer an opinion as to whether Mr. Barrett owned a stake in the business).)  Indeed, Mr. Kyanko's report and valuation were wholly reliant on Mr. Barrett's say-so of what he owned; Mr. Kyanko's assessment even assumed that

---

10

        Q: But you assumed, for purposes of your report . . . . that it was Mr. Barrett who owned [the business], right?
        A: Yes, that's correct.
        Q: Your report doesn't offer any opinion as to who owned the business, does it?
        A: No.
        Q: And you're not in a position to offer any testimony about liability in this case, are you?
        A: No.

(Trial Tr. 167:10–23 (Feb. 13, 2019, PM) (Defendants' cross examination of Mr. Kyanko).)

the Contract was never terminated—neither through the sixty-day notice nor the "fraudulent or unlawful manner" provision. (*See* Trial Tr. 146:14–147:19 (Feb. 13, 2019, PM).) Therefore, Mr. Kyanko's testimony does not aid one in determining whether NELICO breached the covenant of good faith and fair dealing.

Lastly—albeit seen through the privilege of hindsight—the jury itself rejected Plaintiffs' asserted theory for breach of good faith and fair dealing. Although the jury found that Plaintiffs proved by a preponderance of the evidence that NELICO had breached the covenant of good faith and fair dealing (Verdict Form, Question 4), it rejected Plaintiffs' sole theory for this claim—that "NELICO wrongfully seized [Mr.] Barrett's business" and thus owes him "an award for the value of the business that they took from him." (Trial Tr. 71:21–72:1 (Feb. 19, 2019, PM) (Plaintiffs' closing argument); *see also* Trial Tr. 70:23–71:9 (Feb. 19, 2019, AM) (jury charge).) The jury instead awarded Plaintiffs for "revenues (as outlined in the [C]ontract) for the months of Aug & Sept 2012 in their true-up or reconciliation." (Verdict Form, Question 5.) The jury's rejection of Plaintiffs' only asserted theory for this claim further buttresses the conclusion that no reasonable jury would have a legally sufficient evidentiary basis to find that Mr. Barrett could have reasonably expected to sell his NELICO agency (*i.e.*, Barrett Financial) upon termination of the Contract. *See Wilson v. Amerada Hess Corp.*, 773 A.2d at 1130. Accordingly, Defendants' Renewed Motion for Judgment as a Matter of Law is granted in regard to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. The jury's associated verdict and award is vacated, and this Count is dismissed.

## II. Breach of Contract Claims

Under New Jersey law, the plaintiff carries the burden to prove four elements: (1) the parties entered into a contract containing certain terms; (2) the plaintiff did what the contract

required him to do; (3) the defendant did not do what the contract required it to do; and (4) the defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff. *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (internal citation omitted).

A.    *NELICO's Position*

Two different counts are at issue here. First, NELICO contends that the jury erred in regard to its breach-of-contract counterclaim because the jury found that Mr. Barrett breached the Contract but awarded NELICO a total of $0 for the breach. (Verdict Form, Questions 12–13.) Second, the jury found that NELICO breached the Contract when it did not pay Mr. Barrett for the renewal overrides provided for in the Contract. (Verdict Form, Question 1.) NELICO submits that the jury erred only in regard to its follow-up answer—that NELICO failed to prove that Mr. Barrett knowingly acted in a fraudulent or unlawful manner with regard to the H-1B visas that would have resulted in Mr. Barrett's forfeiture of the overrides. (Verdict Form, Question 2.) NELICO requests judgement notwithstanding the verdict or, in the alternative, a new trial for both counts.

B.    *NELICO Is Entitled to a New Trial on Their Counterclaim for Breach of Contract*

NELICO first advances an argument that "mutual breach" of a contract renders *both* parties unable to collect money damages. (Defs.' Br. at 13–14.) Because the jury found that both Mr. Barrett and NELICO breached the Contract, NELICO argues that neither party should recover any damages. NELICO relies on several cases for this proposition, but all of those cases actually stand for the proposition that a mutual breach quashes the possibility of *specific performance*—a form of relief soundly affected by the doctrine of unclean hands.[11]  *See Smith v.*

---

[11] Defendants also rely on *Allied Erecting & Dismantling Co. v. U.S. Steep Corp.*, 2016 U.S. Dist. LEXIS 34692 (N.D. Ohio Mar. 17, 2016), for the proposition that a mutual breach negates

*McLane*, 174 F.2d 819, 821 (3d Cir. 1949) ("Certainly a court of equity will not overlook the 'clean hands' doctrine and grant specific performance . . . if the trustee thereafter fails to perform his part of the bargain."); *Gluck v. Rynda Dev. Co.*, 134 A. 363, 366 (N.J. 1926) (discussing the equitable doctrine of "clean hands" and noting that "[a] court of equity is a court of conscience"); *Bressman v. J&J Specialized, LLC*, No. A-2119-14T1, 2015 N.J. Super. Unpub. LEXIS 2795, at *18 (Super. Ct. App. Div. Dec. 4, 2015) (noting that "a party requesting specific performance must not have breached the contract itself"). Because neither Mr. Barrett nor NELICO seek an equitable remedy, these citations are inapposite to the instant case.

Notwithstanding NELICO's unsuccessful argument regarding mutual breach, the jury's conflicting verdict entitles NELICO to a new trial on its counterclaim for breach of contract. First, the jury's verdict—affirmatively finding that Mr. Barrett breached the Contract yet awarding NELICO $0 in money damages—is inconsistent with New Jersey law. Under New Jersey law, the plaintiff is required to prove that "breach, or failure to do what the contract required, caused a loss to the plaintiff." *Globe Motor Co.*, 139 A.3d at 64; *see also Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 458 (N.J. 1994) ("[A] breach-of-contract claim also require[s] proof of damages."). The Court's jury charge conveyed a similar reading of the law. (*See* Trial Tr. 63:3–8 (Feb. 19, 2019, AM) ("[I]n order to succeed on its [breach-of-contract] claim, the party asserting the claim . . . . must show that, as a result of the other party's failure to fulfill its material obligations, the party asserting the claim . . . was unable to realize the benefits of the contract.").)

---

both parties' claims for relief. (Defs.' Br. at 12–13.) Notably, however, that court applied Pennsylvania law.

Because damages or harm derived from an alleged breach is an essential element of a breach-of-contract claim, the jury's conclusion that Mr. Barrett breached the Contract but caused no harm is inherently incongruous. *See Tannock v. N.J. Bell Tel. Co.*, 537 A.2d 1307, 1310 (N.J. Super. Ct. App. Div. 1988) ("The rule of law related to the certainty of damages requires a party alleging a breach of contract to prove that there was a breach which in fact caused *some* damage." (emphasis added)); *Hart v. Bentley Labs., L.L.C.*, 2010 N.J. Super. Unpub. LEXIS 2038, at *9–13 (Super. Ct. App. Div. Aug. 18, 2010) (affirming court's dismissal at the close of evidence at trial for contractual counterclaims because counterclaimant "failed to show any damages or loss of an expected economic advantage, or any injury, loss, or harm that precluded [counterclaimant] from realizing the benefits of the contract"); *see also Cont'l Vineyard LLC v. Dzierzawski*, 2018 U.S. Dist. LEXIS 209069, at *11 (N.D. Ill. Dec. 12, 2018) (collecting cases holding that a jury's finding of liability is in irreconcilable conflict with its award of zero damages); *Horton v. Ross Univ. Sch. of Med.*, 2006 U.S. Dist. LEXIS 27463, at *22–25 (D.N.J. Mar. 30, 2006) (granting summary judgment where court found breach but no evidence of damages from the breach); *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 833 (E.D. Tenn. 2005) (ordering new trial and "not[ing] an apparent inconsistency between the jury's finding of liability on [p]laintiff's breach of contract claim and award of zero damages" (internal citations omitted)).[12]

---

[12] *But see Nat'l Fin. Support Servs., LLC v. U.S. Mortg. Corp.*, 2007 N.J. Super. Unpub. LEXIS 1276, at *18 (Super. Ct. App. Div. Feb. 13, 2007) (affirming jury's award of zero damages despite its finding that breach occurred); *but see also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1036 (9th Cir. 2003) (discussing cases involving discrepancies between a jury's finding of liability and awarding of no damages and noting that "failure to award damages does not by itself render a verdict invalid"). This Court also found in its research *Stafford Investments, LLC v. Vito*, which held that a district court did not err when it denied a motion for judgment as a matter of law "based on a purported inconsistency with the jury's verdict of finding a breach of contract and a right to rescission, but ordering zero dollars in damages." 375 F. App'x 221, 224 (3d Cir.

Second, the inherent inconsistency of the jury's verdict in regard to this counterclaim demonstrates jury confusion, which by itself supports a new trial. *Cf. Brown v. Nutrition Mgmt. Servs. Co.*, 2010 U.S. App. LEXIS 5535, at *6 (3d Cir. Mar. 17, 2010) (holding that district court did not err where it "ordered the new trial after concluding that the verdict resulted from confusion"). Also, the Court would be remiss to examine the jury's verdict regarding NELICO's breach-of-contract counterclaim in a vacuum. The Court already noted above that, in regard to Plaintiffs' claim for breach of good faith and fair dealing, the jury rejected Plaintiffs' sole theory—that NELICO wrongfully seized Mr. Barrett's business—but nonetheless awarded to Plaintiffs $75,781.66 for "revenues (as outlined in the [C]ontract) for the months of Aug & Sept 2012 in their true-up or reconciliation." (*See* Verdict Form, Question 5.) Mr. Das Gupta testified that NELICO overpaid to Mr. Barrett a bonus of—uncoincidentally—$75,781.66 in 2011, so that Mr. Barrett actually owed that amount back to NELICO based on the reconciliation of his account.[13] (*See* Trial Tr. 155:3–163:10 (Feb. 13, 2019, AM).) The jury simply latched on

---

2010). However similar *Stafford Investments* may appear to the instant case at first blush, this Court does not feel compelled to follow its rationale: it is not a precedential opinion; the parties' claims were based on Pennsylvania law, rather than New Jersey law; the jury was tasked with determining whether rescission, in addition to damages, was appropriate; and the district court provided case-specific reasons as to why the verdict was not inconsistent. The Court of Appeals commented explicitly that it was the district court's case-specific reasons, "[i]nterpreted in *this* manner, [that] the [d]istrict [c]ourt correctly determined that the jury's verdict was not inconsistent." *Id.* (emphasis added).

[13] Mr. Das Gupta explained that NELICO paid a bonus to Mr. Barrett in the beginning of the year, assuming that Barrett Financial would reach its target. Mr. Barrett was to pay a portion of that bonus back if Barrett Financial ultimately did not reach its target.

> For the year 2011 [Barrett Financial] only produced 95 percent of its plan, and by only hitting 95 percent it did not earn two and half percent as it had been paid. It only earned one percent. So [NELICO] had provided a payment, a bonus overpayment equaling two and a half percent, but it only earned one percent. So that difference is what created the overpayment.

to this figure—which was not even contested by the parties—to conjure up an award for Mr. Barrett.  The jury's misunderstanding of the evidence presented in regard to Plaintiffs' claim for good faith and fair dealing further suggests that the jury also may have been confused in regard to NELICO's counterclaim for breach of contract.

Finally, the evidence presented cuts against the jury's verdict.  Although "[a]n allegedly inconsistent verdict does not necessitate a new trial if there is sufficient evidence to support each of the jury's findings," *United States v. Smith*, 183 F. App'x 264, 269 (3d Cir. 2006), the evidence supports a finding that Mr. Barrett owed NELICO amounts following the post-termination reconciliation of accounts.  The Contract provided that within ninety days of termination, NELICO and Mr. Barrett would pay any amounts owed to one another.  (*See* Contract § 17(b).)  Mr. Das Gupta described this process as a reconciliation of accounts and referred to it as a "true-up."  (Trial Tr. 102:16–104:4, 106:5–11 (Feb. 13, 2019, AM).)

Mr. Das Gupta testified in extensive detail about Defendants' Exhibit 51, a summary chart which included "backup sheets," showing the reconciliation for Mr. Barrett and Barrett Financial.  Mr. Das Gupta explained that he reconciled all the amounts that had been forwarded or advanced to Barrett Financial (*i.e.*, credits) against the expenses that Barrett Financial had incurred on behalf of NELICO.  (Trial Tr. 153:5–12 (Feb. 13, 2019, AM).)  He thoroughly discussed each Line Item on Defendants' Exhibit 51—and its backups that support it—that displays either an expense that Mr. Barrett owes to NELICO[14] or a credit that NELICO owes to

---

(Trial Tr. 157:6–12 (Feb. 13, 2019, AM).)  The same is true for the year 2012, where "[NELICO] paid assuming two and a half percent, but . . . [Barrett Financial] had only earned one percent.  And so that difference was $118,000 [simplification from the exact total of $188,350.25]."  (*Id.* 163:11–165:10; *see also* Defs.' Ex. 51, Lines 1–2 (referring to bonus overpayments in 2011 and 2012).)

[14] *See, e.g.*, *supra* note 13 and accompanying text (describing bonus amounts that NELICO overpaid to Mr. Barrett in 2011 and 2012, as reflected in Lines 1–2); Trial Tr. 6:23–16:10 (Feb.

Mr. Barrett.[15]  (*See* Trial Tr. 151:20–165:10 (Feb. 13, 2019, AM); Trial Tr. 6:23–52:23 (Feb. 13,

2019, PM); *see also* Trial Tr. 92:16–98:19 (Feb. 13, 2019, PM) (testifying as to the reliability of

the backup sheets and associated materials).)  In the end, Mr. Das Gupta calculated the total

amount that Mr. Barrett owes to NELICO and subtracted the total amount that NELICO owes to

Mr. Barrett and found that Mr. Barrett owes NELICO a reconciliation of $841,667.74, none of

which has been paid or satisfied.  (Trial Tr. 52:25–53:12 (Feb. 13, 2019, PM); Defs.' Ex. 51.)

And Mr. Barrett did not impugn any of Mr. Das Gupta's asserted figures—even when Plaintiff's

counsel elected to recall him as a witness after Mr. Das Gupta testified.[16]

Certainly "[w]here the subject matter of the litigation is simple and within a layman's

understanding, the district court is given less freedom to scrutinize the jury's verdict," *Hilburn*,

2012 U.S. Dist. LEXIS 106536, at *29 (quoting *Williamson*, 926 F.2d at 1352), but this case was

not simple.  The trial was wrought with accounting principles, financial terms, lengthy

---

13, 2019, PM) (describing overdrafts or "net overpayments" where "outflows" exceeded
"inflows" as reflected in Line 3); Trial Tr. 16:11–19:12 (Feb. 13, 2019, PM) (describing home
office accounts receivable, or charges incurred at NELICO, which are then divided among all of
its agencies, including Barrett Financial, as reflected in Lines 5–6).

[15] *See, e.g.*, Trial Tr. 154:11–155:2, 163:24–165:10 (Feb. 13, 2019, AM) (describing lease
expenses that Mr. Barrett incurred on behalf of NELICO that NELICO now owes back to Mr.
Barrett as reflected in Lines 9–10); *id.* 19:13–21:5 (describing "Broker Pilot" credit as reflected
in Line 7).

[16] Defendants pointed this out during their closing argument:

> [W]ith regard to the calculation that Mr. Das Gupta performed, Mr. Barrett was
> seated at counsel table in this courtroom when Mr. Das Gupta testified.  He had a
> copy of this document, or he could have had a copy of this document in front of
> him.  He was certainly in a position to testify in response to Mr. Das Gupta.  He
> could have gone through Defendants' Exhibit 51 line by line and said that he
> didn't owe the money that was set forth in there.  Or he could have argued for
> some smaller sum, but instead, he sat silent and chose not to rebut that.  And I
> submit that is because he could not.

(Trial Tr. 66:11–24 (Feb. 19, 2019, PM).)

spreadsheets, and intricate testimony. And the foregoing reasons, taken together, support NELICO's request for a new trial concerning its breach-of-contract counterclaim. Accordingly, NELICO's Motion is granted in this regard.

       C.     *NELICO Is Not Entitled to a New Trial on Plaintiffs' Claim for Breach of Contract*

NELICO primarily argues that "[t]he trial record contains ample evidence of the fraudulent statements [Mr.] Barrett made to the federal government on the H-1B visa applications" such as invented job titles, misrepresented degree requirements and duties of the jobs, and underestimated number of hours required. (Defs.' Br. at 20, ECF No. 191-1.) If this were true and Mr. Barrett "knowingly" made these statements, Mr. Barrett would forfeit any payments of renewal overrides owed to him following the termination of the Contract. (*See* Contract § 16.)

During trial, Mr. Barrett testified that the false statements contained in the applications could not be attributed to him because he had not actually read the applications before submitting them. Instead, he claimed, he relied solely on his attorney, Mr. Miller, the preparer of the applications.

NELICO argues that "[u]nder New Jersey law, a signature to a sworn document imparts knowledge of the documents contents to the affiant, irrespective of whether the affiant read its contents." (Defs.' Br. at 18 (citing *New Jersey Siegler*, 97 A.2d 469, 471 (N.J. 1953)).) NELICO's recitation of the law is correct, and the Court explained as much in its charge to the jury. (*See* Trial Tr. 66:11–14 (Feb. 19, 2019, AM) ("The law is that a signature to a sworn document imputes to the affiant—you know, the affiant is the person signing—knowledge of its contents, even though the affiant may not have read the document or claims not to have read the document.").)

However true, "the great weight of the evidence" does not demonstrate that NELICO proved that Mr. Barrett *knowingly* committed fraud in regard to the applications. *See Solomon*, 532 F. App'x at 157. Although under New Jersey law the contents of the H-1B applications are imputed to Mr. Barrett, this imputation does not by itself prove that Mr. Barrett "knowingly act[ed] in a fraudulent or unlawful manner" in accordance with Section 16 of the Contract. For example, simply "knowing" that a submitted H-1B application purports to offer a part-time, rather than a full-time, position to a foreign worker (where the position ultimately was for a full-time worker) does not necessarily constitute fraud if Mr. Barrett actually believed at the time that he was hiring for a part-time position. If Mr. Barrett were to make a mistake about, for instance, the title of an open position or the number of hours required for that position, that lapse would not satisfy the forfeiture clause in the Contract. Indeed, the Court charged the jury to that effect: "An act or omission is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reasons. . . . A person commits fraud when he or she knowingly misrepresents the truth which another person or agency relies upon to the detriment." (Trial Tr. 50:23–25, 60:24–61:1 (Feb. 19, 2019, AM).)

Reviewing the evidence presented, a reasonable jury could have concluded that NELICO failed to carry its burden in proving that Mr. Barrett knowingly made false statements on H-1B applications. First, Mr. Barrett testified that he neither read nor understood at least some of the questions asked in the applications. (*See, e.g.*, Trial Tr. 115:4–130:4 (Feb. 8, 2019, AM), ECF No. 164 (cross examination of Mr. Barrett regarding H-1B applications); Trial Tr. 5:8–56:19 (Feb. 8, 2019, PM), ECF No. 165 (same); Trial Tr. 20:13–30:15 (Feb. 11, 2019, AM) (same); *see also* Defs.' Exs. 26, 28, 30, 76 (H-1B applications).) Instead, a reasonable jury could conclude that he relied on Mr. Miller for finding the information—such as job title, degree requirement,

salary, and required hours—and completing the applications. (*See* Trial Tr. 116:11–117:1 (Feb. 8, 2019, AM) ("I couldn't possibly have filled this out myself. And immigration law . . . is extremely complicated, and you need an expert. . . . I relied on [Mr. Miller] as the expert."); *see also, e.g.*, Trial Tr. 14:22, 19:2–7 (Feb. 8, 2019, PM) ("I don't know, I didn't prepare the forms. . . . Mr. Miller prepared the document and picked the title out of a limited list of job titles that matched the description.").) Several times, when asked why a certain answer was provided on an application, Mr. Barrett responded with some variant of, "You'd have to ask Mr. Miller. He completed the form." (*See, e.g.*, Trial Tr. 124:17 (Feb. 8, 2019, AM).) And Mr. Miller testified that he gathered information for the applications from other individuals affiliated with either Barrett Financial or even NELICO. (*See* Trial Tr. 18:5–27:10 (Feb. 14, 2019, PM).)

Second, NELICO conducted an internal investigation in regard to the H-1B applications but did not terminate Mr. Barrett immediately, as Section 16 of the Contract permits. (*See* Contract § 16 (specifying that "if [Barrett Financial or Mr. Barrett] shall knowingly act in a fraudulent or unlawful manner . . . the Contract shall at once terminate without notice").) Rather, NELICO provided Mr. Barrett with sixty days of notice until his termination was effective, which accords with Section 17 of the Contract. (*See id.* § 17 (conferring either party "the right to terminate the Contract without cause at any prior time" as long as that party provides sixty days of notice).) The Termination Letter merely stated that NELICO was terminating Mr. Barrett "for the reasons that [Ms. Pedigo and Mr. Barrett] discussed." (Pls.' Ex. 18.) And an email, written contemporaneously by Mr. Barrett, provides that "[Mr. Barrett] was advised that this termination was not for cause." (Pls.' Ex. 19.)[17]

---

[17] That email, however, also goes on to say, "During my conversation with [Ms.] Pedigo however, I was advised that the reason was related to H1B [*sic*] visa sponsorships which have been practiced by the North Jersey firm, dating back 30 years, before even my joining [New

28

Lastly, after Mr. Barrett's termination, NELICO submitted a Form U5 to FINRA that provided "LOSS OF CONFIDENCE (NON-SECURITIES RELATED)" as the explanation for Mr. Barrett's termination. (Pls.' Ex. 29.) The report did mention fraud or any of the circumstances surrounding the H-1B applications. A reasonable jury could have construed NELICO's ensuing about-face as a post-hoc rationalization to avoid paying Mr. Barrett his renewal overrides that were owed pursuant to the Contract.

In all, a reasonable jury had a legally sufficient evidentiary basis to find that NELICO failed to prove that Mr. Barrett knowingly committed fraud in regard to the H-1B applications. NELICO stipulated to the amount of damages owed to Mr. Barrett if the jury had found that NELICO breached the Contract and stipulated that NELICO had the burden to prove that Mr. Barrett knowingly committed fraud. (Trial Tr. 25:23–26:10 (Feb. 19, 2019, AM) (parties agreeing that NELICO has the burden).)[18] Because in order to grant a new trial "the great weight of the evidence" must cut against the jury's verdict, Defendants' Motion ultimately fails to clear

_____

England Financial] in 1991." (Pls.' Ex. 19.) Mr. Barrett testified about this email and conversation with Ms. Pedigo, explaining that he was *not* terminated because of the H-1B applications and that Ms. Pedigo told him merely that he had to "stay away from the Koreans." (*See* Trial Tr. 57:21–61:8 (Feb. 8, 2019, PM).)

[18] Specifically, the Contract provided that "if [Barrett Financial or Mr. Barrett] shall knowingly act in a fraudulent or unlawful manner . . . [Mr. Barrett]'s claims for revenue or any other benefit under the Contract . . . shall be forfeited and void." (Contract § 16.) This forfeiture clause operated as a condition subsequent, discharging NELICO's duty to pay Mr. Barrett for the renewal overrides. *See* 8 Corbin on Contracts § 39.1 n.2 (2018) ("[T]he condition subsequent is treated as a form of discharge of obligation."). Like an affirmative defense, Defendants would have carried this burden even if they had not stipulated to it. *See Am. Ass'n of Univ. Professors, Bloomfield Coll. Chapter v. Bloomfield Coll.*, 346 A.2d 615, 616 (N.J. Super. Ct. App. Div. 1975) ("Where a party seeks to avoid a contractual obligation by reason of the happening of an event or condition stipulated in a contract, the burden of establishing the occurrence of the condition rests upon the party asserting it."). Were it otherwise, Mr. Barrett would have been tasked with proving that he did not knowingly commit fraud.

this high hurdle.  Therefore, NELICO is not entitled to a new trial concerning Plaintiffs' claim for breach of contract.

**III.     Plaintiffs' Motion for Pre-Judgment Interest**

Plaintiffs request that the Court alter or amend the Judgment to include pre-judgment interest, post-judgment interest, and associated costs.  (Pls.' Mot. at 1, ECF No. 186.)  Because the Court orders a new trial in regard to Defendants' breach-of-contract counterclaim, Plaintiffs' Motion for Pre-Judgment Interest is premature.  Accordingly, the Court denies the Motion without prejudice at this time.

<u>**CONCLUSION**</u>

For the reasons stated herein, Plaintiffs' Motion to Alter/Amend the Verdict to Include Pre-Judgment Interest is denied without prejudice, and Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Amendment of the Verdict is granted in part and denied in part.  The Court grants judgment as a matter of law in favor of Defendants in regard to Plaintiffs' claim for breach of good faith and fair dealing and orders a new trial in regard to Defendants' counterclaim for breach of contract.  An appropriate order will follow.


Date: <u>05/10/2019</u>                                         */s/ Anne E. Thompson*
                                                                          ANNE E. THOMPSON, U.S.D.J.